1  Steven Craig
2  355 South End Ave, 27L
3  New York, NY 10280

**10 CV 5706**

4  UNITED STATES DISTRICT COURT
5  DISTRICT OF NEW YORK

**STEVEN CRAIG**

Plaintiff,

  vs.

**The Bank of New York Mellon Corporation**

**f/k/a The Bank of New York**

Defendant

Case # _____

**ORIGINAL PETITION**

6

7  Date: _____

8  Comes now Steven Craig, hereinafter referred to as "Petitioner," and moves the court for relief
9  as herein requested:

10  **PARTIES**
11  Petitioner is Steven Craig, 355 South End Ave, 27L New York NY 10280.

12  currently Known Defendant(s) are/is: The Bank of New York Mellon Corporation, f/k/a The
13  Bank of New York, located at 1 Wall Street, New York, NY 10286 by and through its attorney.

14  **STATEMENT OF CAUSE**
15  Petitioner, entered into a consumer contract for the refinance of a primary residence located at
16  1327 Prospect Place, Brooklyn, NY 11213 hereinafter referred to as the "property."

17  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a
18  predatory loan agreement with Defendant.

19  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully
20  crafted scheme intended to defraud Petitioner.

21  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
22  of the types of tactics used by Defendants to defraud Petitioner.

ORIGINAL PETITION

23     Defendants charged false fees to Petitioner at settlement.

24     Defendants used the above referenced false fees to compensate agents of Petitioner in order to
25     induce said agents to breach their fiduciary duty to Petitioner.

26     Defendant's attorney caused to be initiated collection procedures, knowing said collection
27     procedures in the instant action were frivolous as lender is estopped from collection procedures,
28     under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
29     the production of the original promissory note alleged to create a debt.

30     **IN BRIEF**
31     *(Non-factual Statement of Posture and Position)*

32     It is not the intent of Petitioner to indict the entire industry. It is just that Plaintiff will be
33     making a number of allegations that, outside the context of the current condition of the real
34     estate industry, may seem somewhat outrageous and counter-intuitive.

35     When Petitioner accuses ordinary individuals of acting in concert and collusion with an
36     ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
37     unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
38     people, just doing what they have been trained to do, are out to swindle the poor
39     unsuspecting borrower.

40     The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
41     committed by people acting in concert and collusion, one with the other. Petitioner has no
42     reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
43     that what they were doing was part of an ongoing criminal conspiracy, only that it was,
44     and they, at the very least, kept themselves negligently uninformed of the wrongs they
45     were perpetrating. Petitioner maintains the real culprit is the system itself, including the
46     courts, for failure to strictly enforce the consumer protection laws.

47     **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
48     *(General State of the Real Estate Industry)*

49     ***THE BEST OF INTENTIONS***

50     Prior to the 1980's and 1990's ample government protections were in place to protect
51     <u>consumers</u> and the lending industry from precisely the disaster we now experience.
52     <u>During</u> President Clinton's administration, under the guise of making housing available to

ORIGINAL PETITION                                                    

53   the poor, primary protections were relaxed which had the effect of releasing the
54   unscrupulous on the unwary.

55   Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
56   the risk.   Consequently, Americans were engaged in safe and stable home mortgages.
57   With the protections removed, the unscrupulous lenders swooped in and, instead of
58   making loans available to the poor, used the opportunity to convince the unsophisticated
59   American public to do something that had been traditionally taboo; home buyers were
60   convinced to speculate with their homes, their most important investment.

61   Bank Of America, NA, Ameriquest, Countrywide, and many others swooped in and
62   convinced Americans to sell their homes, get out of their safe mortgage agreements, and
63   speculate with the equity they had gained by purchasing homes they could not afford.
64   Lenders created loans intended to fail as, under the newly crafted system, the Lender
65   profited more from a mortgage default than from a stable loan.

66   Companies cropped up who called themselves banks when, in fact, they were only either
67   subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
68   creating and selling promissory notes.   As will be demonstrated, these companies then
69   profited from the failure of the underlying loans.

70   ***HOW IT WORKS***

71   Briefly, how it works is this, the Lender would secure a large loan from a large bank,
72   convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
73   investor.

74   People would set up mortgage companies by securing a large loan from one of the major
75   banks and then convert that loan into 20 and 30 year mortgages.   In order to accomplish
76   this, an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
77   lender who would secure the title from the seller using the borrowed bank funds for that
78   purpose, and then trade the title to the buyer in exchange for a promissory note.

79   The lender then creates a 20 or 30 year mortgage with money the lender must repay within
80   6 months.   As soon as the closing is consummated, the promissory note is sold to an
81   investor pool.

82   Using the instant case as an example, a 456,000.00 note at 8.2450%%  interest over 30
83   years will produce $445,793.11    The lender can then offer to the investor the security

84   instrument (promissory note) at say 50% of it's future value.  The investor will, over the
85   life of the note, less approximately 3.00% servicing fees, realize $618,398.25 .  The lender
86   can then pay back the bank and retain a handsome profit in the amount of $200,649.69.
87   The lender, however, is not done with the deal.

88   The lender signed over the promissory note to the investor at the time of the trade, but did
89   not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
90   Court addressed this issue and stated that such a transaction was certainly legal.  However,
91   it created a fatal flaw as the holder of the lien document, at time of sale of the security
92   instrument, received consideration in excess of the lien amount.  Since the lien holder
93   received  consideration,  he  could  not  be  harmed.    Therefore  the  lien  became  an
94   unenforceable document.

95   This begs the question: if keeping the lien would render it void, why would the lender not
96   simply transfer the lien with the promissory note?  The reason is because the lender will
97   hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
98   amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
99   liability.  The lender, by this maneuver, gets consideration a second time.  And still the
100  lender is not done profiting from the deal.

101  After sale of the promissory note, the lender remains as the servicer for the investor.  The
102  lender will receive 3% of each payment the lender collects and renders to the investor
103  pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep
104  that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the
105  foreclosure.

106  The lender stands to profit more from a note that is overly expensive, than from a good
107  stable loan.   And where, you may ask, does all this profit come from?  It comes from the
108  equity the borrower had built up in the home.  And still the lender is not finished profiting
109  from the deal.

110  Another nail was driven in the American financial coffin when on the last day Congress
111  was in session in 2000 when restrictions that had been in place since the economic
112  collapse of 1907 were removed.  Until 1907  investors were allowed to bet on stocks
113  without actually buying them.  This unbridled speculation led directly to an economic
114  collapse.  As a result the legislature banned the practice, until the year 2000.  In 2000 the
115  unscrupulous lenders got their way on the last day of the congressional session.  Congress

ORIGINAL PETITION                                                              4 of 24

116  removed the restriction banning derivatives and again allowed the practice, this time
117  taking only 8 years to crash the stock market.   This practice allowed the lender to profit
118  further from the loan by betting on the failure of the security instrument he had just sold to
119  the unwary investor, thus furthering the purpose of the lender to profit from both the
120  borrower (consumer) and the investor.

121  The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
122  bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
123  accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
124  were acting under the guise of government regulation and, therefore, the borrower had
125  reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
126  protect the consumer from just this kind of abuse were simply being ignored.

127  The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
128  the referral of the client to the lender by a person acting as an agent for the borrower.
129  Hereinafter, the person or entity who receives any portion of the yield spread premium, or
130  a commission of any kind consequent to securing the loan agreement through from the
131  borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
132  law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
133  seeking out a lender for the borrower, would seek the best deal for his client rather than
134  who would pay him the most.  That was the intent, but not the reality.  The reality is that
135  Agents never come away from the table with less than 2% or 3% of the principal.  This is
136  accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
137  fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
138  product than the borrower qualifies for.  This will generate more profits for the lender and,
139  consequently, for the Agent.

140  It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
141  the fair market price.  This allows the lender to increase the cost of the loan product and
142  give the impression that the borrower is justified in making the purchase.

143  The lender then charges the borrower an underwriting fee in order to convince the
144  borrower that someone with knowledge has gone over the conditions of the note and
145  certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
146  deception of the borrower by placing undue stress on the borrower to sign the large stack
147  of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to

148   insure the transaction.  This trust is systematically violated for the purpose of taking unfair
149   advantage of the borrower.   The entire loan process is a carefully crafted contrive
150   connivance designed and intended to induce the unsophisticated borrower into accepting a
151   loan product that is beyond the borrowers means to repay.  With all this, it should be a
152   surprise to no one that this country is having a real estate crisis.

### PETITIONER WILL PROVE THE FOLLOWING

153
154   Petitioner is prepared to prove, by a preponderance of evidence that:

155   • Lender has no legal standing to bring collection or foreclosure claims against the
156      property;

157   • Lender is not a real party in interest in any contract which can claim a collateral
158      interest in the property;

159   • Even if Lender were to prove up a contract to which Lender had standing to
160      enforce against Petitioner, no valid lien exists which would give Lender a claim
161      against the property;

162   • Even if Lender were to prove up a contract to which Lender had standing to
163      enforce against Petitioner,  said contract was fraudulent in its creation as
164      endorsement was secured by acts of negligence, common law fraud, fraud by non-
165      disclosure, fraud in the inducement, fraud in the execution, usury, and breaches of
166      contractual and fiduciary obligations by Mortgagee or "Trustee" on the Deed of
167      Trust, "Mortgage Agents," "Loan Originators," "Loan Seller," "Mortgage
168      Aggregator," "Trustee of Pooled Assets," "Trustee or officers of Structured
169      Investment Vehicle," "Investment Banker," "Trustee of Special Purpose
170      Vehicle/Issuer of Certificates of 'Asset-Backed Certificates,'" "Seller of 'Asset-
171      Backed' Certificates (shares or bonds)," "Special Servicer" and Trustee,
172      respectively, of certain mortgage loans pooled together in a trust fund;

173   • Defendants have concocted a carefully crafted connivance wherein Lender
174      conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
175      by inducing Plaintiff to enter into a predatory loan inflated loan product;

176   • Lender received unjust enrichment in the amount of 5% of each payment made late
177      to Lender while Lender and Lender's assigns acted as servicer of the note;

ORIGINAL PETITION                                                         6 of 24

178  - Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
179     handling the foreclosure process on a contract Lender designed to have a high
180     probability of default;

181  - Lender intended to defraud Investor by converting the promissory note into a
182     security instrument and selling same to Investor;

183  - Lender intended to defraud Investor and the taxpayers of the United States by
184     withholding the lien document from the sale of the promissory note in order that
185     Lender could then hold the lien for three years, then prepare and file Internal
186     Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
187     and deduct same from Lender's income tax obligation;

188  - Lender defrauded backers of derivatives by betting on the failure of the promissory
189     note the lender designed to default;

190  - participant Defendants, et al, in the securitization scheme described herein have
191     devised business plans to reap millions of dollars in profits at the expense of
192     Petitioner and others similarly situated.

193  ## PETITIONER SEEKS REMEDY
194  In addition to seeking compensatory, consequential and other damages, Petitioner seeks
195  declaratory relief as to what (if any) party, entity or individual or group thereof is the
196  owner of the promissory note executed at the time of the loan closing, and whether the
197  Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
198  Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
199  alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

200  ### *PETITIONER HAS BEEN HARMED*

201  Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

202  Such harm and detriment includes economic and non-economic damages, and injuries to
203  Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

204  In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
205  equitable relief requested herein is granted.

ORIGINAL PETITION

## STATEMENT OF CLAIM

*DEFENDANTS  LACK STANDING*

### No evidence of Contractual Obligation

Defendants claim a controversy based on a contractual violation by Petitioner but have failed to produce said contract.  Even if Defendants produced evidence of the existence of said contract in the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence that a contract actually existed at one point in time.  A copy, considering the present state of technology, could be easily altered.  As Lender only created one original and that original was left in the custody of Lender, it was imperative that Lender protect said instrument.

In as much as the Lender is required to present the original on demand of Petitioner, there can be no presumption of regularity when the original is not so produced.   In as much as Lender has refused Petitioner's request of the chain of custody of the security instrument in question by refusing to identify all current and past real parties in interest, there is no way to follow said chain of custody to insure, by verified testimony, that no alterations to the original provisions in the contract have been made.   Therefore, the alleged copy of the original is only hearsay evidence that an original document at one time existed.  Petitioner maintains that, absent production of admissible evidence of a contractual obligation on the part of Petitioner, Defendants are without standing to invoke the subject matter jurisdiction of the court.

### No Proper Evidence of Agency

Defendants claim agency to represent the principal in a contractual agreement involving Petitioner, however, Defendants have failed to provide any evidence of said agency other than a pronouncement that agency has been assigned by some person, the true identity and capacity of whom has not been established.  Defendants can hardly claim to be agents of a principal then refuse to identify said principal.  All claims of agency are made from the mouth of the agent with no attempt to provide admissible evidence from the principal.

Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the court.

233       **Special Purpose Vehicle**

234     Since the entity now claiming agency to represent the holder of the security instrument is not the

235     original lender, Petitioner has reason to believe that the promissory note, upon consummation of

236     the contract, was converted to a security and sold into a special purpose vehicle and now resides

237     in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue

238     Code and as such, cannot be removed from the REMIC as such would be a prohibited

239     transaction.   If the mortgage was part of a special purpose vehicle and was removed on

240     consideration of foreclosure, the real party in interest would necessarily be the trustee of the

241     special purpose vehicle.   Nothing in the pleadings of Defendants indicates the existence of a

242     special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner

243     cause to believe defendant is not the proper agent of the real party in interest.

244     ***CRIMINAL CONSPIRACY AND THEFT***

245     Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward

246     a criminal conspiracy to defraud Petitioner.   Said conspiracy but are not limited to acts of

247     negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous

248     acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to

249     Petitioner by Lender, which were then used to fund the improper payment of commission fees to

250     Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

251     ***AGENT PRACTICED UP-SELLING***

252     By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.   In so

253     doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact

254     that Agent was licensed by the state.   Agent further defrauded Petitioner by failing to disclose

255     Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to

256     Petitioner and the duty to provide fair and honest services, through a series of carefully crafted

257     connivances, wherein Agent proactively made knowingly false and misleading statements of

258     alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead

259     Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of

260     a loan product offered by the Lender.   Said loan product was more expensive than Petitioner

261     could legally afford. Agent acted with full knowledge that Petitioner would have made a

262     different decision had Agent given complete disclosure.

263      ### *FRAUDULENT INDUCEMENT*

264   Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
265   known, Petitioner could not afford in order to unjustly enrich Lender.

266      ### *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

267   Said more expensive loan product was calculated to produce a higher return when sold as a
268   security to an investor who was already waiting to purchase the loan as soon as it could be
269   consummated.

270      ### Extra Commission for Late Payments

271   Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
272   that Lender intended Petitioner would have difficulty paying.  The industry standard payment to
273   the servicer for servicing a mortgage note is 3% of the amount collected.  However, if the
274   borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
275   Thereby, the Lender stands to receive more than double the regular commission on collections if
276   the borrower pays late.

277      ### Extra Income for Handling Foreclosure

278   Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
279   on which Lender intended petitioner to default.  In case of default, the Lender, acting as servicer,
280   receives considerable funds for handling and executing the foreclosure process.

281      ### Credit Default Swap Gambling

282   Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
283   default swap, commonly referred to as a derivative as addressed more fully below.  Since Lender
284   designed the loan to fail, betting on said failure is essentially a sure thing.

285      ### *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

286   Lender sold the security instrument after closing and received consideration in an amount in
287   excess of the lien held by Lender.  Since Lender retained the lien document upon the sale of the
288   security instrument, Lender separated the lien from said security instrument, creating a fatal and
289   irreparable flaw.

ORIGINAL PETITION                                                                          10 of 24

290  When Lender received consideration while still holding the lien and said consideration was in
291  excess of the amount of the lien, Lender was in a position such that he could not be harmed and
292  could not gain standing to enforce the lien.  The lien was, thereby, rendered void.

293  Since the separation of the lien from the security instrument creates such a considerable concern,
294  said separation certainly begs a question: "Why would the Lender retain the lien when selling the
295  security instrument?"

296  When you follow the money the answer is clear.  The Lender will hold the lien for three years,
297  then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
298  the full amount from Lender's tax liability, thereby, receiving consideration a second time.

299  Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
300  lien to the holder of the security, however, the lien once satisfied, does not gain authority just
301  because the holder, after receiving consideration, decides to transfer it to someone else.

302  ### *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

303  Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
304  information that Lender had as a result of creating the faulty loans sure to default.  Lender was
305  then free to invest on the bet that said loan would default and stood to receive unjust enrichment
306  a third time.  This credit default swap derivative market scheme is almost totally responsible for
307  the stock market disaster we now experience as it was responsible for the stock market crash in
308  1907.

309  ### *LENDER CHARGED FALSE FEES*

310  Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
311  Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
312  vendor.

313  Lender charged other fees that were a normal part of doing business and should have been
314  included in the finance charge.

315  Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
316  did Lender or Trustee provide documentation to show that the fees herein listed were valid,
317  necessary, reasonable, and proper to charge Petitioner.

ORIGINAL PETITION                                                                11 of 24

| 803 | Appraisal | $196.00 |
| 804 | Credit Report | $450.00 |
| 805 | Lenders Inspection Fee | $450.00 |
| 808 | Broker Origination Fee | $6,840.00 |
| 809 | Tax Service FEE | $90.00 |
| 810 | Flood Check Fee | $26.00 |
| 903 | Hazard Insurance | $1,325.00 |
| 1001 | Hazard Insurance   1 month  110.42 | $110.42 |
| 1003 | City Property Taxes  1 month 127.32 | $127.32 |
| 1102 | Abstract or Titile search | $725.00 |
| 1107 | Attorney fee | $865.00 |
| 1108 | Title Insurance | $3,012.00 |
| 1201 | Recording Fee | $845.00 |
| 1202 | City/county tax/stamp | $1,815.00 |
| 1203 | State tax/stamps | $11,575.80 |
| 1205 | ACRIS Filing Fee | $150.00 |
| 1301 | Survey End fee | $212.00 |

318   Petitioner was unable to determine whether or not the above fees were valid in accordance with
319   the restrictions provided by the various consumer protection laws. The Petitioner sent a QWR
320   (qualified written request) via certified mail to the defendant which by law the defendant was
321   required to respond to.  The defendant failed to respond within 20 days that they received the
322   QWR nor did they attempt to correct any of this issues stated in the QWR within 60 days. This is
323   in direct violation of RESPA. The defendant did not provide a complete billing from each vendor
324   who provided the above listed services; the complete contact information for each vendor who
325   provided a billed service and did not stipulate as to the specific service performed and whether
326   the said service was necessary. They did not provide a showing that the cost of said service is
327   reasonable; a showing of why said service is not a regular cost of doing business that should
328   rightly be included in the finance charge.

329   The above charges are hereby disputed and deemed unreasonable as the defendant did not
330   demonstrate them to be reasonable, necessary, and in accordance with the limitations and
331   restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

332   The defendant has failed to properly document the above charges, borrower will consider same
333   as false charges.  The effect of the above amounts that borrower would pay over the life of the
334   note will be an overpayment of $373,254.83

335   ***RESPA PENALTY***

336   From a cursory examination of the records, with the few available, the apparent RESPA
337   violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
338   Lending Statement not within limits compared to Note, Truth in Lending Statement not timely

339   presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
340   No 1st Payment Letter.

341   The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
342   Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
343   statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
344   disclosure letter; loan discount fee disclosure; business insurance company arrangement
345   disclosure; notice of right to rescind.

346   The courts have held that the borrower does not have to show harm to claim a violation of the
347   Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance.  And,
348   in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
349   no more than two thousand, considering the large number enumerated here, it is reasonable to
350   consider that the court will assess the maximum amount for each violation.

351   Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
352   the note, borrower has calculated that, the number of violations found in a cursory examination
353   of the note, if deducted from the principal, would result in an overpayment on the part of the
354   borrower, over the life of the note, of $382,068.73.

355   If the violation penalty amounts for each of the unsupported fees listed above are included, the
356   amount by which the borrower would be defrauded is $337,913.95

357   Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
358   variance, it appears that lender intended to defraud borrower in the amount of $1,093,237.51

359   ***LENDER CONSPIRED WITH APPRAISER***

360   Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
361   purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
362   duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
363   inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
364   Petitioner.

365   ***LENDER CONSPIRED WITH TRUSTEE***

366   Lender conspired with the trust Agent at closing to create a condition of stress for the specific
367   purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
368   fully understand what was being signed.

ORIGINAL PETITION                                                    13 of 24

369  The above referenced closing procedure was a carefully crafted connivance, designed and
370  intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
371  to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
372  did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
373  as required by various consumer protection statutes.

374  ### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

375  In the manner in which Defendants have carried on their business enterprises, they have engaged
376  in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
377  (Deceptive Practices Act).

378  Such conduct comprises a pattern of business activity within the meaning of such statutes, and
379  has directly and proximately caused Petitioner to suffer economic and non-economic harm and
380  detriment in an amount to be shown according to proof at trial of this matter.

381  ### *EQUITABLE TOLLING FOR TILA AND RESPA*

382  The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
383  Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

384  Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
385  *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
386  are subject to a one-year limitations period; however, such claims are subject to the equitable
387  tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
388  subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
389  that given the remedial purpose of TILA, the limitations period should run from the date of
390  consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
391  circumstances, suspend the limitations period until the borrower discovers or has reasonable
392  opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
393  *v. California, 784 F.2d 910, 915 9*th Cir. 1986).

394  Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
395  anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
396  that such limitations period may be equitably tolled. The Court of Appeals for the District of
397  Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

ORIGINAL PETITION                                                                14 of 24

398   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986)*, while the Seventh Circuit came to the
399   opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
400   *Cir. 1997)*. District courts have largely come down on the side of the Seventh Circuit in holding
401   that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
402   *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
403   *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988)*. Importantly, the Ninth Circuit, as noted above, has
404   interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
405   language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914*. While not
406   of precedential value, this Court has previously found both the TILA and **RESPA** limitations
407   periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
408   *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

409   The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
410   by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
411   existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
412   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000)*.
413   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
414   any wrongful conduct by the Defendants. Santa Maria. at 1178.

415   ### *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
416   ### *STANDARDS*

417   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
418   assets by, for example, providing W-2 statements, tax returns, bank statements, documents
419   evidencing title, employment information, and other information and documentation that could
420   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
421   ability to repay a particular loan over both the short and long term. Defendants deviated from and
422   disregarded these standards, particularly with regard to its riskier and more profitable loan
423   products.

424   **Low-Documentation/No-Documentation Loans.**

425   Driven by its desire for market share and a perceived need to maintain competitiveness with the
426   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
427   documentation loan products, including the HARMs and HELOCs described hereinabove, and
428   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to

the already eased underwriting standards to the point of disregarding such standards. This quickened the loan origination process, allowing for the generation of more and more loans which could then be resold and/or securitized in the secondary market.

Defendants marketed no-documentation/low-documentation loan programs that included HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated income" or "stated assets" (SISA) neither of which were verified. Employment was verbally confirmed, if at all, but not further investigated, and income, if it was even considered as a factor, was to be roughly consistent with incomes in the types of jobs in which the borrower was employed. When borrowers were requested to document their income, they were able to do so through information that was less reliable than in a full-documentation loan.

For stated income loans, it became standard practice for loan processors, loan officers and underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated income loans, emphasizing loan origination from a profitability standpoint at the expense of determining the ability of the borrower to repay the loan from an underwriting standpoint, encouraged the overstating and/or fabrication of income.

**Easing of Underwriting Standards**

In order to produce more loans that could be resold in the secondary mortgage market, Defendants also relaxed, and often disregarded, traditional underwriting standards used to separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing the base FICO score needed for a SISA loan.

Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate used to determine whether borrowers can afford the loan), loan to value ratios (the amount of loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-income ratios (the amount of monthly income compared to monthly debt service payments and other monthly payment obligations.

With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-term financial circumstances, approving the loan based on the initial fixed rate without taking into account whether the borrower could afford the substantially higher payment that would inevitably be required during the remaining term of the loan.

458   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
459   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
460   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
461   interest payments.

462   As Defendants pushed to expand market share, they eased other basic underwriting standards.
463   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
464   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
465   eased underwriting standards the Defendants also were encouraging consumers to go further into
466   debt in order to supply the very lucrative aftermarket of mortgage backed securities.  The relaxed
467   underwriting standards created the aftermarket supply they needed. As a result, the Defendants
468   made it easy for the unwary consumer to take on more debt than he could afford by encouraging
469   unsound financial practices, all the while knowing defaults would occur more and more
470   frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
471   standards.

472   Defendants knew, or in the exercise of reasonable care should have known, from its own
473   underwriting guidelines industry standards that it was accumulating and selling/reselling risky
474   loans that were likely to end up in default. However, as the pressure mounted to increase market
475   share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
476   underwriting guidelines. Such was the environment that loan officers and underwriters were,
477   from time to time, placed in the position of having to justify why they did not approve a loan that
478   failed to meet underwriting criteria.

479   **Risk Layering**

480   Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
481   loans with one or more relaxed underwriting standards.

482   Defendants knew, or in the exercise of reasonable care should have known, that layered risk
483   would increase the likelihood of default. Among the risk layering Defendants engaged in were
484   approving HARM loans with little to no down payment, little to no documentation, and high
485   DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
486   the loans it promoted to borrowers.

ORIGINAL PETITION                                                                    17 of 24

487   Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
488   mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
489   believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
490   business ignored basic established underwriting standards and acted to mislead the borrower, all
491   to the detriment of the borrower and the consumer of loan products..

492   Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
493   engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
494   business practices described above in paragraphs 30-42 of this Complaint

495   ***UNJUST ENRICHMENT***

496   Petitioner is informed and believes that each and all of the Defendants received a benefit at
497   Petitioner's expense, including but not limited to the following: To the Agent, commissions,
498   yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
499   be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
500   surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
501   resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
502   percentages of payment proceeds, charges, and other "back end" payments in amounts to be
503   proved at trial; To all participants, the expectation of future revenues from charges, penalties and
504   fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

505   By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
506   and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
507   deprived, and is entitled to restitution in the amount of $1,093,237.51

508   ***CLAIM TO QUIET TITLE.***

509   Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
510   the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
511   interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
512   and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

513   Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
514   power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
515   interest in the Subject Property has been rendered void and that the Defendants are not the holder

ORIGINAL PETITION                                                                          18 of 24

516 in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
517 involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

518     "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
519     scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
520     *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
521     *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
522     *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
523     *Rptr. 2d 752 (2d Dist. 1995).*

524 ### *SUFFICIENCY OF PLEADING*

525 Petitioner has sufficiently pled that relief can be granted on each and every one of the
526 Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
527 doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
528 entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
529 allegations of material fact in the complaint are taken as true and construed in the light most
530 favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

531 Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
532 8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
533 theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
534 *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
535 conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
536 should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
537 Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
538 their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
539 relief as requested herein should be granted.

540 ## CAUSES OF ACTION

541 ### *BREACH OF FIDUCIARY DUTY*

542 Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
543 duty of care with respect to the mortgage loan transactions and related title activities involving
544 the Trust Property.

545   Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
546   breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
547   all applicable laws governing the loan transactions in which they were involved, including but
548   not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

549   Defendant's breaches of said duties were a direct and proximate cause of economic and non-
550   economic harm and detriment to Petitioner(s).

551   Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
552   all to be shown according to proof at trial of this matter.

553   *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

554   Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
555   duty to properly perform due diligence as to the loans and related transactional issues described
556   hereinabove.

557   In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
558   X and Z promulgated there under to, among other things, provide proper disclosures concerning
559   the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
560   or should have known that borrowers could not afford or maintain, and to avoid paying undue
561   compensation such as "yield spread premiums" to mortgage Agents and loan officers.

562   Defendants knew or in the exercise of reasonable care should have known, that the loan
563   transactions involving Petitioner and other persons similarly situated were defective, unlawful,
564   violating of federal and state laws and regulations, and would subject Petitioner to economic and
565   non-economic harm and other detriment.

566   Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
567   Z promulgated there under were intended and designed to protect, and the conduct alleged
568   against Defendants is the type of conduct and harm which the referenced statutes and regulations
569   were designed to deter.

570   As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
571   non-economic harm in an amount to be shown according to proof at trial.

ORIGINAL PETITION                                                                    20 of 24

### AGENT: COMMON LAW FRAUD

If any Agents' misrepresentations made herein were not intentional, said misrepresentations were negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable ground for believing them to be true.

Agents made these representations with the intention of inducing Petitioner to act in reliance on these representations in the manner hereafter alleged, or with the expectation that Petitioner would so act.

Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents in their negligent misrepresentation, and that various Agents were negligent in not implementing procedures such as underwriting standards oversight that would have prevented various Agents from facilitating the irresponsible and wrongful misrepresentations of various Agents to Defendants.

Petitioner is informed and believes that Agent acted in concert and collusion with others named herein in promulgating false representations to cause Petitioner to enter into the LOAN without knowledge or understanding of the terms thereof.

As a proximate result of the negligent misrepresentations of Agents as herein alleged, the Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of opportunities, attorney fees and costs, and other damages to be determined at trial. As a proximate result of Agents' breach of duty and all other actions as alleged herein, Defendant has suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and mental and physical pain and anguish, all to Petitioner's damage in an amount to be established at trial.

### PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Petitioner properly pled Defendants violated the breach of implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261 Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

ORIGINAL PETITION                                                      21 of 24

600   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
601   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

602   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
603   particular significance, in part because of the special relationship between the insurer and the
604   insured. The insurer, when determining whether to settle a claim, must give at least as much
605   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
606   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

607   Likewise, there is a special relationship between an Agent and borrower. "A person who
608   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
609   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
610   consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
611   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
612   *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
613   *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
614   (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
615   [*Emphasis Added*].

616   All Defendants, willfully breached their implied covenant of good faith and fair dealing with
617   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
618   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
619   product without regard for other more affordable products; (4) Placed Petitioner into a loan
620   without following proper underwriting standards; (5) Failed to disclose to Petitioner that
621   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
622   valid and /or properly documented substitutions and assignments so that Petitioner could
623   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
624   request for documentation of the servicing of Petitioner's loan and the existence and content of
625   relevant documents. Additionally, Defendants breached their implied covenant of good faith and
626   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
627   right under an alleged power of sale because the purported assignment was not recorded and by
628   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
629   special relationship inherent in a real estate transaction between Agent and borrower, *and* all
630   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

ORIGINAL PETITION                                                          22 of 24

631  ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***
632  ***SEQ***

633  Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation

634  contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of

635  Action as though the same were set forth herein.

636  Petitioner is informed and believes that Defendant's violation of the provisions of law rendered

637  the credit transaction null and void, invalidates Defendant's claimed interest in the Subject

638  Property, and entitles Petitioner to damages as proven at trial.

639  ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

640  The conduct committed by Defendants, driven as it was by profit at the expense of increasingly

641  highly leveraged and vulnerable consumers who placed their faith and trust in the superior

642  knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by

643  civilized society.

644  Defendants either knew that their conduct would cause Petitioner to suffer severe emotional

645  distress, or acted in conscious and/or reckless disregard of the probability that such distress

646  would occur.

647  Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the

648  conduct of Defendants as described hereinabove.

649  As a result of such severe emotional distress, Petitioner suffered economic and non economic

650  harm and detriment, all to be shown according to proof at trial of this matter.

651  Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by

652  Petitioner and secure to Petitioner quite title;

653  Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner

654  as payments to Defendants based on the fraudulently secured promissory note in an amount to be

655  calculated by Defendants and verified to Petitioner;

656  Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the

657  amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be

658  equal to $3,279,712.53

ORIGINAL PETITION                                                  23 of 24

**PRAYER**

WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them, as follows:

For an emergency restraining order enjoining lender and any successor in interest from foreclosing and selling the Petitioner's Property pending adjudication of Petitioner's claims set forth herein;

For a permanent injunction enjoining Defendants from engaging in the fraudulent, deceptive, predatory and negligent acts and practices alleged herein;

For quiet title to Property;

For rescission of the loan contract and restitution by Defendants to Petitioner according to proof at trial;

For disgorgement of all amounts wrongfully acquired by Defendants according to proof at trial;

For actual monetary damages in the amount $1,093,237.51;

For pain and suffering due to extreme mental anguish in an amount to be determined at trial.

For pre-judgment and post-judgment interest according to proof at trial;

For punitive damages according to proof at trial in an amount equal to $3,279,712.53.

For attorney's fees and costs as provided by statute; and,

For such other relief as the Court deems just and proper.

**Respectfully Submitted,**

Steven Craig

ORIGINAL PETITION                                                                 24 of 24